Steven N. Williams (SBN 175489)
Mark F. Ram (SBN 294050)
Joyce Chang (SBN 300780)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577
swilliams@cpmlegal.com
mram@cpmlegal.com
jchang@cpmlegal.com

Warren Burns (*Pro Hac Vice* Pending)
Spencer Cox (*Pro Hac Vice* Pending)
Will Thompson (CA State Bar No. 28902)
**BURNS CHAREST LLP**
500 North Akard, Suite 2810
Dallas, TX 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
scox@burnscharest.com
wthompson@burnscharest.com

Korey Nelson (*Pro Hac Vice* Pending)
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN KOZELKA, on Behalf of Herself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>MYLAN N.V., and MYLAN SPECIALTY L.P.,<br><br>                              Defendants. | Case No. 0:16-cv-<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ................................................................................................1

II. JURISDICTION AND VENUE ...........................................................................................1

III. PARTIES ..............................................................................................................................2

IV. FACTUAL ALLEGATIONS ...............................................................................................2

    A. Allergies and Anaphylaxis ........................................................................................2

    B. The EpiPen ................................................................................................................3

    C. Mylan's Relentless EpiPen Price Increases ..............................................................4

    D. Mylan's Attempted Damage Control ........................................................................6

    E. Mylan's 2016 Financial Forecasts .............................................................................7

    F. Harm to California Consumers and Children ...........................................................7

    G. Mylan's Conduct Violates California Public Policy .................................................9

V. CLASS ACTION ALLEGATIONS ...................................................................................12

    A. Certification under Federal Rule of Civil Procedure 23(b)(3): Superiority and Predominance. ..................................................................................................13

VI. TOLLING OF THE STATUTE OF LIMITATIONS .........................................................14

VII. CAUSE OF ACTION .........................................................................................................14

COUNT ONE: Violation of California's Unfair Competition Law
(Cal. Bus. & Prof. Code § 17200 *et seq.*) ..................................................................................14

VIII. PRAYER FOR RELIEF .....................................................................................................15

DEMAND FOR JURY TRIAL .....................................................................................................16

Plaintiff Robin Kozelka, by and through her undersigned attorneys, files this original class action complaint, both individually and on behalf of a class of all those similarly situated. This complaint is based upon information and belief and the investigation of counsel except as to those allegations about Plaintiff personally.

## I. NATURE OF THE ACTION

1. This case arises out of one of the most shocking and cruelest examples of corporate greed in recent memory. To extract maximum profits from its monopoly in the epinephrine autoinjector market, Mylan N.V. raised the price it charges for its EpiPen device to levels far beyond what is reasonable or fair to consumers relying on this life-saving device. Today, Mylan charges $609 for a two-pack of EpiPens that costs no more than $20 to make.

2. Mylan's unfair and oppressive pricing leaves thousands of California children and adults exposed to a risk of death from a food allergy or bee sting simply because they or their families cannot afford to pay the hundreds of dollars now charged by Mylan for EpiPens. Those families who can pay have been overcharged by thousands.

3. Plaintiff, individually and on behalf of all others similarly situated, now seeks an award of restitution and any other appropriate relief that they are due because of Mylan's unlawful conduct.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; the aggregate amount in controversy exceeds $5,000,000; and minimal diversity exists.

5. This Court has personal jurisdiction over Defendants because Defendants continually and systematically transact business within the State of California. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred and/or emanated from this District, and Mylan has caused harm to class members residing in this District.

6. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred and/or emanated from this District, and Mylan has caused harm to class members residing in this District.

## INTRADISTRICT ASSIGNMENT

7. For purposes of intradistrict assignment pursuant to Civil Local Rules 3-2(c) and 3-2(d), assignment in the San Francisco division of this District is proper because a substantial part of the events which give rise to the claim occurred in San Francisco County.

### III. PARTIES

8. Plaintiff Robin Kozelka is a resident of California and resides in San Francisco, California. On at least one occasion during the Class Period (as defined below), Ms. Kozelka purchased an EpiPen for personal, family, or household purposes.

9. Defendant Mylan N.V. is a corporation organized under the laws of the Netherlands with its headquarters in Canonsburg, Pennsylvania. Mylan N.V. maintains its headquarters in Canonsburg, Pennsylvania. Mylan N.V. was created following the corporate inversion of the former Mylan Pharmaceuticals, Inc. ("Mylan"), a corporation organized under the laws of West Virginia with its headquarters in Canonsburg, Pennsylvania.

10. Defendant Mylan Specialty L.P., formerly known as Dey Pharma, is a limited partnership organized under the laws of Delaware with its headquarters in Basking Ridge, New Jersey (hereinafter, "Dey"). Dey is a wholly owned subsidiary of Mylan.

### IV. FACTUAL ALLEGATIONS

**A. Allergies and Anaphylaxis**

11. One out of every thirteen children in California has serious food allergies. A food allergy occurs when the body's immune system mistakenly identifies a food protein as a threat and attacks it. The most common food allergens include everyday items like peanuts, milk, soy, wheat, and shellfish.

12. Anaphylaxis is a severe, often fatal allergic reaction. Food allergens are the most common cause of anaphylaxis, although insect stings, latex, and medications can also be potential triggers.

13. The symptoms of anaphylaxis include swelling of the tongue and throat, and reduced blood pressure and circulation, leading to weakness, a loss of consciousness, and, if untreated, death.

14. Anaphylaxis is <u>always</u> considered a life-threatening medical emergency.

15. Epinephrine, also known as adrenaline, is a medication and hormone used for emergency treatment of severe allergic reactions (including anaphylaxis) caused by foods, insect bites or stings, medicines, or other substances. Epinephrine is also used to treat anaphylaxis that is caused by unknown substances or triggered by exercise. Epinephrine is available only by prescription.

16. Epinephrine is very effective at treating anaphylaxis, but it must be administered immediately. A delay in receiving epinephrine of as little as 30 minutes can lead to a child's death.

17. An epinephrine autoinjector is the most effective tool for quickly administering epinephrine to a child in distress. Simply put, epinephrine autoinjectors keep children alive.

18. While using an epinephrine autoinjector, the patient injects the epinephrine into the muscle of their outer thigh through the device's spring-loaded needle. Patients are advised to carry the medication with them at all times for emergency use if they are at risk of having a severe allergic reaction.

**B.     The EpiPen**

19. The EpiPen is the most popular epinephrine injection device, or autoinjector. The United States Food and Drug Administration approved EpiPen almost 30 years ago on December 22, 1987.

20. The EpiPen contains a 0.3 mg dose of epinephrine; the EpiPen Jr. contains a 0.15 mg dose of epinephrine. For simplicity, this complaint uses the term "EpiPen" to refer to both products.

21. Healthcare professionals recommend that parents of children with severe allergies keep multiple EpiPens handy at home, school, and work, leading many parents to purchase multiple EpiPens.

22. EpiPens, which are prefilled with the hormone epinephrine, expire after a year. Patients are advised to replace outdated medicine.

23. Additionally, it is recommended that EpiPens be stored at room temperature, and away from exposure to heat, moisture, or direct light. If an EpiPen is exposed to heat or direct light in any substantial amount, its effectiveness is greatly reduced, requiring parents to replace it by purchasing a new EpiPen.

### C. Mylan's Relentless EpiPen Price Increases

24. Mylan acquired Dey in 2007 from Merck. Dey has worldwide rights to the EpiPen auto injector.

25. The market for epinephrine autoinjectors is large and dominated by the EpiPen. The epinephrine autoinjector market is now worth a reported $1.3 billion, and Mylan holds an 85% market share with its EpiPen.

26. Demand for the EpiPen has grown substantially in recent years, largely due to Mylan's marketing, branding, and public awareness campaigns.

27. When Mylan first acquired the EpiPen in 2007, it was priced at approximately $57 per EpiPen. Today it is priced at $600.

28. Since late 2009, Mylan has raised the price of the EpiPen an astounding 15 times.

29. On October 12, 2009, Mylan raised the price of two EpiPens to $124.

30. In 2010, Mylan stopped making single EpiPens available for sale. Now, EpiPens can be purchased only in two-packs, doubling the price that consumers must pay,

even if they need only one EpiPen. Although Mylan cited its concern for patient safety in moving to two-pack only sales, it continues to sell single EpiPens internationally.

31. On October 18, 2011, two years and four price increases later, an EpiPen 2-Pak cost $181.

32. After four more price increases, two EpiPens cost $265 as of July 17, 2013.

33. Three more price increases raised the price of an EpiPen 2-Pak to $401 on November 5, 2014.

34. Mylan continued to hike the price of the EpiPen throughout 2015 and into 2016. One of those increases came in November 2015, only a month after the main rival to the EpiPen (an autoinjector called Auvi-Q) was pulled from the market.

35. As of May 2016, two EpiPens cost $609.

36. Since Mylan acquired Dey, the price of EpiPens in California and the United States has become completely untethered to their production cost and is unethical and unfair to consumers given the relatively miniscule cost of making the EpiPen device.

37. EpiPen's active ingredient—epinephrine—costs about $1.00.

38. A two-pack of EpiPens costs less than $10 to make.

39. Often, drug manufactures charge premium prices for brand name drugs in order to recover money spent in researching and creating a drug and gaining FDA approval, all of which can take years.

40. Mylan, however, did not invent the EpiPen—it simply bought it.

41. Heather Bresch, Mylan's CEO, testified to Congress that Mylan had to raise the price of EpiPens from $100 to $600 in order to recoup the more than one billion dollars Mylan has invested "to enhance the product and make it more available."

42. That testimony was misleading, at best.

43. As the California legislature has recognized, "The formula of EpiPen [has] not change[d], and it is no more effective in protecting against allergic reactions in 2016 than it was in 2007."

44. According to PA Consulting Group, a UK-based technology consulting firm that designs auto-injectors for pharmaceutical companies, Mylan's improvements to the EpiPen since 2009 likely required redesign and capital costs running into the "double-digit millions." That is a far cry from the $1 Billion figure Bresch cited during her testimony.

45. In reality, most of the money Mylan has spent on the EpiPen has not gone to creating a superior product, but towards marketing and lobbying costs, which Mylan labels "access and awareness programs."

46. Mylan's lobbying expenses have been money well-spent, at least from Mylan's perspective. In 2013, Congress passed the School Access to Emergency Epinephrine Act in order to promote the purchases of epinephrine auto-injectors by state school systems. Mylan's lobbying efforts have also resulted in similar legislation passed by state legislatures.

### D.   Mylan's Attempted Damage Control

47. Even as Mylan boosted its gross profit margin on EpiPens in the U.S. to an estimated 75 percent last year by raising prices, it cut prices in the United Kingdom.

48. The price of two EpiPens ranges from less than $100 in France to just over $200 in Germany.

49. The price of the EpiPen in other countries confirms that Mylan makes what it considers an acceptable profit on the EpiPen at those prices.

50. Mylan recognizes the injurious nature of its EpiPen price increases. In an attempt to quell the public outrage at its behavior, Mylan recently announced that it will offer a "savings card" that will cover up to $300 of the price of an EpiPen 2-Pak for "patients who are facing the burden of higher out-of-pocket costs."

51. The savings card program will not be available to all consumers and, unlike a permanent price cut, the program expires on December 31, 2016.

52. The savings card implicitly recognizes that the EpiPen 2-Pak is priced at least $300 higher than needed for Mylan to make a fair and reasonable profit.

53. In a further attempt to quell the public furor, Mylan publicly announced on August 29, 2016, that it would make a generic version of the EpiPen available "in several weeks." Five weeks later, however, Mylan reportedly told Bloomberg news that the generic version was expected "by the end of the year." If Mylan does makes a generic EpiPen available, it is still expected to cost $300 per pack, or about the same price as Mylan charged for a non-generic EpiPen 2-Pak as recently as 2014.

54. On October 7, 2016, Mylan announced that it had agreed to pay $465 Million in order to settle a Department of Justice investigation into allegations that Mylan overcharged Medicaid by knowingly and wrongfully classifying the EpiPen as a generic drug.

55. Mylan's intentional misclassification of the EpiPen to Medicaid is further evidence of Mylan's lack of corporate ethics and an institutional culture of satisfying its greed for profits at any cost.

E. **Mylan's 2016 Financial Forecasts**

56. Mylan forecast 2016 revenue for the EpiPen in the United States of approximately $1.1 Billion on roughly 8 Million EpiPens sold.

57. Mylan estimates that those sales will result in a 2016 gross profit of over $800 Million, and an operating profit of $671 Million.

58. In 2012, Mylan reported an operating profit of $306 Million on sales of 7.3 Million EpiPens.

59. Thus, due to its constant price hikes, Mylan estimates it will see a 125% increase in EpiPen gross profit as compared to 2012, while selling only 9% more EpiPens.

60. Put another way, Mylan has tripled the cost of the EpiPen since 2012, even though its costs increased only about 15%.

F. **Harm to California Consumers and Children**

61. Mylan's conduct has inflicted substantial harm on California consumers.

62. Californians without health insurance have suffered financial harm from Mylan's unceasing price increases. Millions of Californians were uninsured in 2015—leaving thousands forced to pay Mylan's skyrocketing prices out of pocket.

63. Even Californians who have health insurance have suffered unnecessary financial harm due to Mylan's conduct because many health plans do not cover the cost of EpiPens. In addition, for those consumers whose plans do cover EpiPen costs, that coverage does not kick-in until the insured first pays the applicable plan deductible amount out of pocket. Thus, many insured Californians have nonetheless paid out-of-pocket for EpiPens.

64. Those Californians able to pay for the EpiPen have been overcharged hundreds of dollars for each EpiPen. When considering that healthcare professionals recommend patients keep an EpiPen in multiple locations, and that EpiPens must be replaced on a regular basis, a conservative estimate of the harm to a typical California EpiPen family runs into the several thousands of dollars.

65. Those customers—the ones who somehow meet Mylan's ransom prices—are the lucky ones.

66. In 2013, almost half of California children were living in or near poverty.

67. The parents of those children, who simply do not have the money to buy an EpiPen, face a terrible lose-lose decision: (1) take their chances with an expired EpiPen; or (2) go without and pray that an ambulance arrives before their child dies from anaphylactic shock.

68. Cruelly, Mylan's price hikes have left tens of thousands of California children vulnerable to dying from a common peanut butter sandwich.

69. Although Mylan's high fees for EpiPens are most harmful to consumers, Mylan has also overcharged countless California schools, hospitals, and healthcare insurance providers for EpiPens.

70. Mylan's claims that it will provide a "savings cards" and other programs to lower costs will not affect the exorbitant prices charged to insurers, employers, and schools.

71. Ultimately, those costs are passed on to consumers through higher taxes (or fewer services in other areas) and insurance premiums.

### G. Mylan's Conduct Violates California Public Policy

72. Mylan's grossly excessive and unfair EpiPen pricing violates public policy.

73. California's Senate Joint Resolution No. 29 unequivocally condemns Mylan's course of conduct in marketing and pricing the EpiPen. In particular, the California Senate and Assembly declared that "unnecessary and unexplained increases in pharmaceutical pricing is a harm to our health care system that will no longer be tolerated . . . ." The resolution also:

   a. Urges "the Congress of the United States to investigate the impact that Mylan NV's monopoly has had on price increases for EpiPen";

   b. Encourages "the Congress and President of the United States to take action to limit the unrestrained ability of drug manufacturers to increase prices based on what the market can bear";

   c. Describes Mylan's consistent price hikes for the EpiPen even though "[t]he formula of EpiPen did not change, and it is no more effective in protecting against allergic reactions in 2016" than before the increases;

   d. Condemns Mylan's "aggressive marketing and lobbying effort to increase demand for the EpiPen"; and

   e. Lists numerous harmful effects on consumers, insurance companies, and the state, including many of those identified above.

74. California also has a statutorily-demonstrated specific public policy in favor of increasing epinephrine and epinephrine autoinjector access for children.

   a. California Education Code § 49414 requires public schools to provide epinephrine auto-injectors to trained personnel and specifically permits

nurses and trained personnel to administer auto-injectors to children experiencing an anaphylactic reaction.

b. California public policy also recognizes the life-saving and critical nature of epinephrine autoinjectors, requiring by statute that the California Emergency Medical Services Authority establish training standards for the use of epinephrine auto-injectors. *See* Cal. Health & Safety Code § 1797.197a.

c. In order to promote the quick administration of epinephrine, the California legislature has also provided that trained personnel who administer an auto-injector in good faith and without compensation are exempt from liability for civil damages. *See* Cal. Civ. Code § 1714.23.

d. Effective January 1, 2017, California law allows pharmacies to prescribe epinephrine autoinjectors directly to "authorized entities." Cal. Bus. & Prof. Code § 4119.4.

75. Those policies are echoed by similar federal statutes:

a. The U.S. School Access to Emergency Epinephrine Act, 42 U.S.C. 280g(d), exhibits a federal public policy to promote access to epinephrine by giving preference to states that require public schools to maintain a supply of epinephrine and permit school personnel to administer epinephrine.

b. 21 U.S.C. § 2205, entitled "Food Allergy and Anaphylaxis Management," requires the development of guidelines to "manage the risk of food allergy and anaphylaxis in schools . . . ."

76. Unsurprisingly, California public policy is also in favor of promoting children's access to health care:

a. California has extended its "Medi-Cal" program to individuals under the age of 19, even if they are unable to establish "satisfactory immigration status." *See* Cal. Welf. & Inst. Code § 14007.8.

      b. In enacting that statute, the California legislature declared that "No child in California should endure suffering and pain due to a lack of access to health care services." Cal. Stats. 2015 ch. 709.

77. California has a strong public policy favoring the fair and reasonable pricing of health care:

      a. Section 1374.21 of the California Health and Safety Code requires that individuals and small business owners be notified if regulators find that the premium for their health care plan is "unreasonable" or "unjustified."

      b. The California Health and Safety Code contains an entire chapter focused on fair pricing policies for hospitals and emergency physicians. *See* Cal. Health & Safety Code, Division 107, Part 2, Chapter 2.5 "Fair Pricing Policies".

      c. In California Business & Professions Code § 657, the legislature declared that:

          i. "Health Care should be affordable and accessible to all Californians," and

          ii. "The public interest dictates that uninsured Californians have access to basic, preventative health care at affordable prices."

      d. Article 6.2 of the California Health and Safety Code provides for state review of rate increases for health care service plan contracts (with some exceptions). *See* Cal. Health & Safety Code § 1385.02.

78. The California Unfair Competition Law exhibits a public policy in favor of providing increased protection from unfair practices that harm persons who have a "physical . . . impairment that substantially limits one or more life activities." Cal. Bus. & Prof. Code § 17206.1. There is no question that children who are vulnerable to potentially fatal allergic reactions are deserving of that protection.

## V. CLASS ACTION ALLEGATIONS

79. Plaintiff brings this lawsuit as a class action on behalf of herself, and all others similarly situated as members of the proposed class, under Federal Rules of Civil Procedure 23(a) and (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

80. The Class is defined as:

> All California natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons who purchased an EpiPen from January 1, 2009 to the date of this Complaint (the "Class Period").

81. Excluded from the Class are the defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

82. **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, it is estimated that 700,000 California children are susceptible to severe food allergies for which they were likely prescribed an EpiPen. Joinder of thousands of plaintiffs is impracticable. The disposition of the claims of the class in a single action will provide substantial benefits to all parties and to the Court. Further, the Class Members are readily identifiable from healthcare and business records.

83. **Typicality:** The representative plaintiff's claims are typical of the claims of the Class Members in that the representative plaintiff, like all Class Members, purchased the EpiPen. Moreover, Plaintiff, like all Class Members, purchased one or more EpiPens at grossly inflated prices as a result of Mylan's conduct.

84. **Commonality**: There are numerous questions of law and fact common to Plaintiff and the Class Members, and those issues predominate over any question affecting

only individual Class Members. The common legal and factual issues include the following:

    a. The financial impact on EpiPen purchasers;

    b. The impact on individuals who needed an EpiPen but were unable to afford to purchase one;

    c. Mylan's reasons, justifications, and motives for each price increase;

    d. The utility to Mylan of its price increases other than pure profit, if any;

    e. Whether Mylan violated California public policy by repeatedly raising the EpiPen's price far beyond what it charges in other jurisdictions;

    f. Whether Mylan engaged in conduct that violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*;

    g. Whether Plaintiff and the class members are entitled to equitable relief, including declaratory relief; and

    h. Whether Plaintiff and the other Class members are entitled to restitution and other monetary relief and, if so, in what amount.

85. **Adequate Representation**: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and antitrust class actions, and Plaintiff intends to prosecute this action vigorously.

### A. Certification under Federal Rule of Civil Procedure 23(b)(3): Superiority and Predominance.

86. Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Mylan's wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the

proposed class who could not individually afford to litigate a claim such as is asserted in this complaint. This class action likely presents no difficulties in management that would preclude maintenance as a class action.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

87. Mylan's frequent and unceasing increases in the list price of the EpiPen, and the sales made at those exorbitant prices, constitute a continuing violation of the UCL.

## VII. CAUSE OF ACTION

### COUNT ONE: Violation of California's Unfair Competition Law
### (Cal. Bus. & Prof. Code § 17200 *et seq.*)

88. Plaintiff re-alleges and incorporate by reference all the above allegations as if fully set forth herein. Plaintiff brings this claim on behalf of the Class Members.

89. The California Unfair Competition Law prohibits "unlawful" and "unfair" business acts or practices.

90. For each EpiPen sold during the class period, Mylan charged Plaintiff and the Class Members prices that were grossly excessive and in violation of California public policy.

91. Mylan's injurious course of conduct was specifically aimed at extracting maximum profit from consumers, without regard to the financial impact on consumers or the increased risk imposed on children whose families were unable to keep up with Mylan's ever-increasing prices.

92. Mylan's unfair business practices offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

93. Class members have suffered injuries in fact and lost money as a direct result of Mylan's unlawful and unfair business acts and practices described above.

94. As a direct and proximate result of Mylan's violation of the California Unfair Competition Law, Plaintiff and the Class Members have been damaged in an ascertainable amount to be determined at trial.

95. Plaintiff and the Class seek restitution and any other just and proper relief available under the California UCL.

96. Plaintiff and the Class also seek attorneys' fees under California Code of Civil Procedure § 1021.5. This action will enforce an important right affecting the public interest; it will confer a significant benefit on the Class and the California public, and the financial burden of private enforcement makes such an award appropriate.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class Members, respectfully requests as follows:

A. An order determining this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B. An order designating Plaintiff as the named representative of the class, and the appointment of the undersigned as Class Counsel;

C. Judgement temporarily and permanently enjoining Mylan from continuing the unfair business conduct and practices alleged in this complaint;

D. Judgement against Mylan in favor of Plaintiff and Class Members;

E. Any and all applicable statutory and civil penalties;

F. An order requiring Mylan to pay both pre- and post-judgment interest on any amounts awarded;

G. An award of costs and attorneys' fees, as allowed by law;

H. Leave to amend this Complaint to conform to the evidence produced at trial; and

I. Such other or further relief as the Court may deem appropriate, just, and equitable.

Law Offices
COTCHETT, PITRE & MCCARTHY, LLP

CLASS ACTION COMPLAINT    15

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff requests a jury trial on all matters so triable.

Dated: November 9, 2016                     Respectfully submitted,

/s/ Steven N. Williams
Steven N. Williams (SBN 175489)
Mark F. Ram (SBN 294050)
Joyce Chang (SBN 300780)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577
swilliams@cpmlegal.com
mram@cpmlegal.com
jchang@cpmlegal.com

Warren T. Burns (*Pro Hac Vice* Pending)
Spencer Cox (*Pro Hac Vice* Pending)
Will Thompson (CA State Bar No. 28902)
**BURNS CHAREST LLP**
500 North Akard, Suite 2810
Dallas, TX 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
scox@burnscharest.com
wthompson@burnscharest.com

Korey A. Nelson (*Pro Hac Vice* Pending)
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com

*Attorneys for Plaintiff*

---

Law Offices
COTCHETT, PITRE & MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                                          16